The next case on the docket is 519-0103, Foster v. Stathan. Is it Martin? Yes. Okay. Good afternoon. May I please report to the counsel? My name is Curtis Martin. I'm with the firm of Shaw & Martin, PC, here in Mount Vernon. I represent the respondent appellant, Norman Allen Stathan. He's referred to as Allen in the brief. This is an appeal of a plenary order of protection that was entered in February of this year by the Search Board of St. Clair County under the Illinois Domestic Violence Act of 1986. Under that Act, Section 205, the burden, of course, is on the petitioner. And the best case that I cited from the Supreme Court, decided in 2006, tells us that there are basically two questions that need to be addressed when a petition for an order of protection is filed, and that is, one, whether the petitioner has been abused, as that Act defines that, and then secondly, whether the petitioner has proven that abuse by a preponderance of the evidence. The standard of review for this court under the best court's decision is the manifest way to the evidence. The trial court's decision is against the manifest way to the evidence if an opposite conclusion is clearly evident or the findings are unreasonable, arbitrary, or not based on the evidence as has been presented. The trial court entered the plenary order of protection, finding that my client had engaged in physical abuse and harassment of the petitioner. The emergency order or emergency petition that had been filed in December of 2018, coupled with the testimony of the petitioner at the hearing in February of 2019, was a little bit difficult to follow, as you can see from the record. But because there are a few written allegations in the petition and then there are several allegations that were testified to that weren't contained in the original petition that had been filed. I noticed that you made a point to that in the brief, that there were things that were brought out at trial at the hearing that were not alleged in the brief. Did you object to that?  Were there any objections? Not that I saw. I mean, because, you know, we allow liberal amendments. You can make them even after the judgment is entered. So if nobody objects, it doesn't seem to me that that's an issue. Well, the reason I made it an issue, Your Honor, is because it wasn't, as I said in my brief, it wasn't an example of clarity to try to follow as to what exactly were the allegations, because there were some general ones and then there were more specific ones and it just seemed to go all over the place to try to figure out, okay, what exactly is she alleging was abuse? What exactly is she alleging to be harassment? And so you try to do your best to glean from both the written allegations and then the oral allegations she made during the trial as it just sort of spontaneously seemed to come about. So that's why I made it. It's probably because you weren't the trial lawyer. I wasn't the trial lawyer. I won't say anything further than that. But your client's notes certainly seem random as well. I mean, the notes were introduced into evidence as part of the evidence of harassment, following her repeatedly, right? Well, the testimony with regard to following her repeatedly was not clear, to say the least. The only thing that was alleged with regard to following her or, quote, staking out or stalking or whatever term might be used there was an allegation that on Thanksgiving of 2018, sitting down the road in his van and drove by her home slowly. Then she throws out some allegations, oh, yeah, he was staking me out at other places and my children saw this, my grandchildren saw this, giving no specifics of anything with regard to those allegations. But I was so impressed. I actually copied these things. There's like minute by minute or half hour by half hour. She's still over there, over there, over there, and then she came home, and then she's over there, and now she's back again. I mean, you don't think that's evidence of stalking? Well, no. I know you're representing a client, but, I mean, the written evidence, at least, seems to support her testimony. Oh, well, and we do have a manifest weight standard here, don't we? Yes. And there was testimony that he threw her down, choked, bit, and bruised her, wasn't there? Yes. And there was also testimony that she had thrown a radio at him, struck him in the head first. She had also ---- But that's for the trier effect, isn't it? Well, yes, but ---- Were there cross petitions? No. No. In fact, part of the problem with this, Your Honor, is that this is an allegation that some of these things took place in 2015, and we're now proceeding in late 2018, early 2019, on an emergency petition, or a plenary hearing with regard to an emergency petition that had been entered in December. So the question that comes to my mind, at least, how far do we go back? How many of these allegations do we take to support a conclusion or allegation that this is an emergency in nature? Especially since they came back and lived with one another. Exactly. This is a 10-year relationship where they, by their own admission, at least had separated at least twice, maybe more. But you just said this was an emergency situation. This is not an appeal of an emergency order protection. It's a plenary. Yes, sir. So there's a very big difference between an emergency and a plenary. Well, yes. Of course, the emergency was the preliminary point that brought about the plenary order, but the emergency petition itself, the claim for an emergent need for the order of protection, was based on matters that were facts or encounters that took place in 2015, some three years earlier, three and a half years earlier, actually. He did not deny the eavesdropping device, did he? No, he didn't. And how long was that in the home before it was discovered? About a month. Oh, well, I take that back. It was there by my client's admission for about a month. How long it had been there before it had been discovered, I don't know the answer to that. I don't know if that answers your question. So that was the evidence before the trial court? Yes. So where we began here was in these allegations of 2015, one of which took place in June by my client's testimony because the petitioner didn't remember. But there were some allegations of hot grease being poured on the foot, and the petitioner claimed, well, it was my client who simply accidentally knocked that grease on his foot. But one thing that was, well, there were a couple of comments that were pointed by the petitioner. One of them was that she made a comment during her cross-examination that if she was going to throw some hot grease on the respondent, it sure wouldn't have been only on his foot. So then we have the other incident in 2015, which was in August, and that was the physical altercation that took place between them that began by, according to the petitioner, my client hurling a racial slur at her, but her initial response was to throw a radio at him and get him in the head. And then, you know, as the saying goes, all hell breaks loose, I suppose. One of her other written allegations was an incident in October 22nd of 2018, and that's where she, in writing, alleges that my client attempted to fight with her, that she told him to leave, and then he leaves and sits down in his car and sends her mean, text messages, which she also says she blocked. Now, when she began to testify, however, she said that while she and her son and my client were in her home, my client apparently had slammed the door of the bathroom. She didn't like that. She confronted him about his rude behavior and then claims that my client, in her words, came at her, to which her response or her reaction was, come on with it, and then my client leaves. Contrary to what she said in writing, she testified that she didn't testify, I should say, that she told him to leave. What she had put in writing, she asked him or told him to leave. She then testifies, no, I didn't tell him to leave. He just left. So now you're arguing credibility of her as a witness. Oh, yes. Yes, absolutely. And, again, we have to give a lot of credence to that trial judge who was sitting there. Well, you do. Right. Yes, but that doesn't eliminate your ability to take a step back and say, wait a minute, let's look at the entirety of the circumstance. How many instances are needed for the court to issue a plenary order? Instances of? Abuse and neglect. Two? Well, I. I mean, if the court makes a finding of one physical abuse or one, and one stalking, that's really enough to issue an emergency and a plenary order, right? Well, I think that, yes. Just two? Yes. So when you start talking about all of these, I mean, you're right, it's going back to who knows when. The judge doesn't really say to us what she used as the basis for issuing the order, does she? No. And that's part of why I'm taking the broad approach to plenary. It's much more difficult. Yes, exactly. I agree. Exactly. One other matter with regard to the October 22 incident is that my client testified that the petitioner had pulled a kitchen knife on him. Which gives some credence to the explanation as to why he just left. He had a knife pulled on him. He's out of there. Now, when you turn to the text messages, she admits that she blocked them, and she had no idea what they said, whether they were mean, nice, conciliatory, accusatory, whatever they were. She didn't know what they were. But yet that was part of her basis for his harassment toward her with regard to text she didn't know anything about. So, again, I suggest that there is certainly no evidence of any abuse or harassment on October 22, 2018. Now, she also alleges in her petition, the written petition, that my client had, quote, slashed, end quote, her tire, apparently on a Thursday before she filed her petition on December 4, 2018, which I guess looking at the calendar would have been late November of 2018. But she admits she never saw him do it. She admits no one else saw it. She didn't present anyone who saw it. Of course, now my client denies it. The parties have broken up many times before, and there has been no kind of physical damage to anybody's property by her own admission. And... Mr. Martin? Yes. What is the effect of a plenary order on your client? Like, can he get an FOID card, for example? No. No what? No, he cannot get the, no. So the fact that an order got entered against him, he has to surrender an FOID card, assuming he had one? Yes. Okay. Yes, that's correct. And then is he allowed to get one for two years? No. No, only upon the expiration of the terms or its reversal or vacating, is he able to then make an application to Illinois State Police for it to be reinstated. And there's a particular process for that. Process for that. Yes. The petitioner, when we venture into the going outside the parameters of the written petition, she alleged that she had received a card from my client in November of 2018, which he admits. I'm sorry, not a card. It was a letter. And he admitted that, and he admitted that he sent it to her because he was seeking to possibly reconcile with her, because there had been many times before that they had broken up and they had been reconciled. She admitted there wasn't anything threatening about it, but yet she brings it up and it goes back to answer your question, well, why am I addressing these things? Well, I had to because there were so many things that were thrown to the wall. We have to challenge each of those things, and that's why we're doing that here. So she admits she wasn't threatened by that. She then says that she received a Christmas card with $200 in it around December of 2018, which Allen denies, but she certainly didn't indicate that there was any emotional distress from having received a Christmas card with money in it. I already talked to you about the Thanksgiving 2018 event, and also with regard to her just broad, conclusory accusations that he was staking her out without giving any more specifics. I mean, the only specific time she gave any testimony to was the Thanksgiving 2018 event, which my client denies, but nothing else, yet she goes on and says he was staking her out, stalking her. But does he deny that? Based on the notes that were taken from him, or that he produced? I would suggest that the notes had to do with the recording device, not the stalking issue there. What does that mean, that they had to do with the recording device? Well, he made notes, and those, I think, were presented with the recording. He made notes, and they were also presented as an exhibit with the recording device, what was presented as a booklet for the recording device of what had been stated in her home. So that's what I was referencing there that had to do with the recording device. But, I mean, he seems to document certain things like, I'm there, she's telling me off, in quotes. I mean, it seems as though there's maybe part of this hearing-listening device and then part of his own diary. No? Yes? No. I mean, does he acknowledge that? I don't. There wasn't any testimony regarding that in the record. So they just speak for themselves. I'm not trying to acknowledge her answer, I just don't know the answer to it. All right. You only have a few minutes. Thank you. Mr. Blunt. Thank you, Your Honor. May it please the Court. For the oral record, my name is Curtis Blunt from Collinsville, and I represent Peggy Foster, and we ask that the judgment of St. Clair County District Court be affirmed. I left off the brief faux pas on my part. This is Land of Lincoln's case. I'm here for Land of Lincoln today, but it's still their case. Obama? Yes. Good grief. We thank you. You know, I cookie-cutter the brief covers, they all look the same to me, and then I get here and, oh, my goodness, I left them off the brief. I'm so sorry, but they belong in the brief. Standard of review, as Justice Moore pointed out, it's manifest weight of the evidence. As counsel pointed out, it's manifest weight of the evidence. And this was a classic he said, she said case. The trial court just checked boxes on the written order, but on the bench she said, I find harassment and I find physical abuse. Physical abuse, I don't know what she could have been talking about other than the incident with the racial slur followed by the thrown radio, followed by the beating, and apparently quite a beating. And at trial, he pleaded self-defense. Self-defense has its limits. And, of course, it's for the circuit court to determine if those limits have been exceeded. And in this case, okay, there's a toaster, I mean, there's a radio thrown, and my client says, threw me down, bruised and bit me, bit my finger, pulled my hair, choked me, broke a bone. She doesn't say where. The police came. They took photographs. Where are the photographs? They're in the record. He claims he was injured. Where is his photographs? Police didn't arrest him, her, they arrested him. He was in jail for three weeks. She got him out by refusing to prosecute. He finally prevailed upon her to not prosecute him. Manifest way to the evidence. Is that physical abuse? Trial court obviously found that it was, and I think we're done here. That's it. She also found harassment. The statute defines harassment and goes on to say that there are certain behaviors that are presumptively would cause emotional distress. And repeatedly surveilling the abused person is one of those. Repeated. Repeated means more than once, right? She testified it happened the first time at Thanksgiving dinner. He's apparently got a distinctive automobile, and they saw him driving slowly past the house with the lights off. That's what she said. Happened later when the children went to school, so we know it was a later day because children don't go to school on Thanksgiving night. And he had the house staked out outside. That's statutory definition. Repeated surveillance, right there. That's it. That's the harassment. That's not contrary to the manifest way. The physical abuse isn't contrary to the manifest way. Only need one. Got both. I think that's our case. That's our case here. The grease. The grease on the foot. Yeah, she said, if I'd have thrown grease at him, that's not where I'd have thrown it. Yeah, I suppose we could have got her to get mad enough to say if I had a gun, I'd have shot him. But she didn't have a gun, and she didn't throw the grease. Trial court believed her, not him. Her testimony was he was drunk and goofing around the stove. The trial court apparently believed it. There were no objections based on the evidence exceeding the petition, Your Honor, just in case you asked. There weren't any objections on that basis. There were no objections on scope of time. And yet both sides were represented by counsel, and both counsel cross-examined. Judge asked questions of both parties. My own reading of it is it would be nice to have a tremendous record here, but so often in these cases we don't. And so often in these cases you've got to put a lot together from a little, and it probably doesn't belong here. There's not much of a record. But it's enough. It's enough. There was no cross-petition for an order of protection. I believe, Justice, that was your other question. There wasn't any. Again, we'd ask that the order of the St. Clair County Circuit Court be affirmed, and thank you for the hearing. Thank you. Mr. Blood, what about this surveillance device? He didn't mention that. Oh, I completely overlooked that. But he admitted it. I'll be darned. Never thought he would do that. I turned the page, and my goodness, he admitted it. Don't know exactly when it was, although she describes it in a long paragraph that doesn't all match together, but the way she seemed to read it was he'd moved out already, and then she'd had to move something about her knees had gone bad, and she'd moved into an apartment from after living with him, and she couldn't get down the stairs because of her knees. So then she had moved into a house, and when she was moving either into or out of that house, then she found the device. So I'm thinking is there a burglary involved here too? Is there a breaking and entering? I'm not sure. It seems like there almost had to be. There's a lot of questions raised by that. Another question that I have is what was the device? Well, is it your position that that's an incident of stalking to support the reporter? Well, it's certainly an incident of harassment. It's a harassment that is by definition something that would cause emotional distress to a reasonable person and does in fact cause emotional distress. And as far as what would cause emotional distress, it would certainly distress me. If I was to go home tonight and find a listening device, it would distress the heck out of me. As for whether it did cause emotional distress, I'm getting a vibe that this order of protection, plenary order, could not stand unless my client used magic words. It caused me emotional distress. But I don't think that the trial court is limited in that way. I think the trial court can listen to the testimony and derive the sense in which it's being delivered, whether the alleged abused person was distressed or not. I think that's part of the judge's job. And I believe the judge did that in this case. Did I answer the question? I think so, yes. I tried. Thank you. Thank you, Mr. Boyle. Mr. Bonner. Your Honors, counsel indicated that the judge made a finding when she recited her order, aside from checking the boxes on the form of the order. But if you know what her findings were, you don't know what they are. She just says, I find physical abuse, I find harassment. And no basis to specify that. But is there anything in the statute that requires the court to make specific findings of the specific instances or, you know, why they were finding that? I know there is that in the juvenile code. But as far as an order of protection, and I was just looking, I can't find anything that requires specific findings by the trial court of the specific instances. I think you're right that the statute doesn't require that. But I think in fairness for purposes of appeal, for example, how is my client to defend her findings if she just says, I find abuse, I find harassment. And in focusing on the harassment issue with regard to the recording device, there is certain presumptions within the definition of harassment. And harassment is knowing conduct not necessary to accomplish a purpose reasonable under the circumstances that would cause a reasonable person emotional distress and does cause a person emotional distress or the petitioner, in this case, emotional distress. Certain presumptions or conduct is presumed to create that emotional distress and fall within the definition of harassment. And I think there's a list of about eight of those. Absent among them is a device for surveillance purposes. And I tried to draw the court's attention to the contrast with regard to the stalking no contact statute. I think that section is 740 ILCS 21-10, which specifically says it's an act of stalking if you use a device to surveil a person. Well, that's absent from the Domestic Problems Act. And so it would seem to me, at least it's my argument to the court today, that there is a difference in what the legislature sought to define as harassment and what it sought to define as stalking that would subject a person to a no contact order. You don't think there could be some overlap between those statutes? Well, to answer that, Your Honor, I would suggest that the legislature has been very specific in what it defines to be harassment, what it defines to be abuse, and so forth, and very specific in what it defines to be stalking and what would subject a person to a no contact order. So the best way I can answer that is I think the legislature has been very specific in how it's defined those two things, and I don't see the overlap there. For example, we have here a stakeout alleged. And would the stakeout also be supportive of a stalking situation? It very well could, yes. But the presumed conduct, one of those is where a person is remaining present outside a home, a school, a vehicle, a place of work, or other place occupied by the petitioner, or even appearing in the window. That's one of the presumed conducts that falls under the definition of harassment. So they weren't so specific to say, if you're a peeping tom, that could be a definition or fall within the definition of harassment. But they didn't say in that specificity that, oh, by the way, you have a listening device that you use to surveil someone, and that's also one of the presumed conduct. And my point behind that presumption issue is, Judge, and it does go back to the point that counsel was making here, is, oh, well, she didn't use the magic words that caused me emotional distress. Well, how else is the court to find it if it doesn't have the evidence that it caused her emotional distress? How else are we supposed to know? Do we guess? She needs to testify. I mean, there were photographs of the record. I'm sorry. She was physically assaulted. Yes, she claims she was. I know there's no doubt about the photographs in the records, so then we get back to the credibility of the witnesses, right? Yes, yes, we do. And I suggest to the court that there's plenty of uncredulous testimony that she provided, whether it was in a general nature or whether she was, you know, going very broad in some of what she said. So I think taking a step back and looking at this, this is a situation outside of the Tamras, if I pronounced that right, Tamras and Wilson cases, where the appellate courts said, you know, you can't, a petitioner can't use a petty argument to exaggerate it into a basis for an order of protection. And I suggest that these people had a longstanding, volatile relationship over time. They broke up many, many times. And she basically said to the trial court during her testimony, you know, I just got tired of it. This back and forth, I just got tired of it. Didn't want to have it anymore. So for those reasons, we ask that the order of protection be reversed. Thank you. Okay. Gentlemen, thank you very much for your patience this afternoon. We'll take the matter under advisement and issue an order.